**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **2:11-cr-69** |
| **v.** | ) | |
| | ) | |
| **RICHARD HAYES,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Presently pending before the Court is the AMENDED MOTION TO SUPPRESS EVIDENCE (Doc. No. 44), filed by Defendant Richard Hayes ("Defendant" or "Hayes"), with brief in support (Doc. No. 58). The government filed a response in opposition (Doc. No. 61), incorporating by reference its Omnibus Response to Defendant's Pretrial Motions (Doc. No. 40) where appropriate. The Court also held a suppression hearing on May 30, 2012, which was continued and concluded on June 26, 2012, in which it heard testimony from six (6) witnesses; transcripts of those proceedings have been filed of record (Doc. Nos. 47, 50).[1] Accordingly, the motion is now ripe for disposition.

## Factual Background

The events leading up to this case began on Friday, February 18, 2011 when Kathleen Wells, a manger of distribution operations at the United States Postal Service ("USPS") Pittsburgh Processing and Distribution Center in Warrendale, PA, was notified of a problematic package that had entered the facility during her 6:30 p.m. to 3:00 a.m. shift. Wells, who had served in that position for six years with twenty-one additional years of experience in USPS

---

1. The Court will designate any reference to the May 30, 2012 and/or the June 26, 2012 transcript(s) of the hearing(s) as "Tr. 1 at *n*" and "Tr. 2 at *n*" respectively.

management, oversaw the processing and distribution of Priority and Third Class Mail packages, including on that day.

Around midnight that evening, Wells was notified that a taped package had come partially unsealed and that an odor was emanating from the parcel. Pursuant to her managerial responsibilities, Wells was asked to inspect the package and to make a determination whether to secure it with additional tape and send it along for delivery, or to take any other measures. Wells proceeded to the processing area of the facility, a four minute walk from her location.

Upon her arrival, she observed the Priority Mail package with its top unsealed sitting on a cart with four or five employees congregating around the area who inquired as to whether she could "smell it" as she approached. (Tr. 1 at 7). At that point, Wells indicated that she "really hadn't smelled anything" and questioned the employees regarding what led to the unsealed condition of the package, later estimated as approximately twenty four inches in length and twelve to fourteen inches in width. The employees explained that a heavy parcel had landed on top of the package, damaging it.[2] While USPS trains its workforce at the facility to reapply tape and send along packages that come open when the damage is not severe, the employees in this instance noticed a particular smell when they went to put the flaps back together and, therefore, notified their supervisor (*i.e.*, Wells) immediately. According to Wells, she overheard the employees sarcastically conversing amongst themselves that the odor resembled the smell of marijuana. *See* Tr. 1 at 36 ("THE COURT: When you arrived on the scene then, did I hear you say that the other workers that were around the box were saying, it's pot, it's marijuana? THE WITNESS: They were not saying it to me. You could hear them in between themselves, you know what I mean, making smart cracks, being sarcastic.").

---

2. When Wells testified, she estimated that of the 125,000 to 150,000 packages that USPS processes at that facility each day, approximately forty to fifty packages are damaged.

Wells soon confirmed the employees' belief with regard to the nature of the odor when she bent over the package, seemingly matching the smell to marijuana based on her experiences thirty years ago when she was at parties where it was being smoked.[3] Wells also noticed a black plastic bag when she lifted the loose flap to examine the damage that the package had sustained.

Pursuant to her training, Wells directed an employee to roll the cart into her office in order to remove the package from the workroom floor. Once she isolated the suspected marijuana, Wells notified the postal inspection service, gave the operator basic information about the package and conveyed her concerns. The operator informed Wells that a local postal inspector would contact her soon.

Shortly thereafter, the National Law Enforcement Communication Center ("NLECC") contacted the local postal inspector on call at that time—later identified as Steven Celletti who had eight years of experience in that capacity—to inform him that a parcel at the Warrendale bulk mail center may contain illegal drugs. In turn, Celletti telephoned Wells at some point in her shift to learn more about what she had supposedly found. On the call, Celletti inquired into whether Wells could lock up the package in a secure location and informed her that he would pick up the suspect parcel on Saturday. Celletti also asked that Wells place the package in a plastic bag after she reported that the odor became much stronger once in her relatively small office, as compared to the relatively faint smell on the open workroom floor. Based on those two requests, Wells put the package in a large clear plastic bag and secured it in her locked office. According to Wells later testimony, had she not removed the package from the stream of mail and workers instead taped up and processed it by 3:00 a.m. that morning, the parcel would have been sent to the local post office for Saturday delivery; however, Saturday delivery was not necessarily expected as the package was shipped as Priority Mail, which does not have a one to

_____
3. Wells admits that she is unaware of any difference between the scent of smoked and unsmoked marijuana.

two day money-back delivery guarantee as Express Mail does and instead has a delivery goal of within two to three days of mailing.

Nevertheless, Celletti arrived at the USPS bulk mail center to retrieve the package on Saturday February 20, 2011 in the late morning or early afternoon. A maintenance manager, supposedly the only other person with access to Well's office, unlocked her door for Celletti. While in the office, Celletti pulled the package from the plastic bag to view the parcel closer and immediately noticed the odor of marijuana; Celletti had smelled marijuana on at least sixty (60) to seventy (70) prior occasions. During that process, the contents almost spilled out from the damaged box, and he observed a bundle wrapped in a cellophane-like plastic. Celletti immediately placed the package back into the plastic bag that Wells had used and proceeded back to his office in Robinson Township with the parcel which he ultimately locked in their Prohibited-Mail Narcotics ("PMN") room under a personalized security alarm code. As testified, had Celletti determined that the suspicions of the USPS employees were unfounded and therefore had not taken the package to his office, it would have arrived at its marked destination, 1634 Broadhead Street, but not until at least Tuesday, February 23, 2012 because the USPS does not deliver priority mail on Sundays or on a federal holiday, *i.e.*, Presidents' Day.

Later that weekend, Celletti e-mailed another Postal Inspector, Brian Plants, to request that he take over the investigation. Plants had been employed in that capacity for approximately eight years and involved in the investigation and discovery of drug contraband in U.S. mail parcels on about sixty-five occasions. Celletti did not take any further investigatory action and the package remained secure in the PMN room for the next three days due to the holiday weekend.[4]

---

4. Celletti did not conduct further investigation in this matter based on his professional judgment, and he testified that his reasons included (1) his belief that it was "absolutely not" possible to obtain and execute a federal search

On Tuesday February 22, 2011, Plants accepted his colleague's request and resumed the investigation. When he received the package from the PMN room, he immediately began to prepare an application for a search warrant regarding the suspect parcel, contacted the U.S. Immigration and Customs Enforcement ("ICE") task force should he require support for a controlled delivery, and called the United States Attorneys' Office for assistance in securing the warrant. A Federal Prosecutor advised Plants that the Duty Magistrate Judge would not be available until Wednesday morning.

The following day, Magistrate Judge E.S. Swearingen granted a search warrant for the package and inspectors found a large block of marijuana inside. Based on their discovery, the law enforcement personnel investigating this case decided to carry out a controlled delivery to the residence on the parcel, which was addressed to "Erika Williams."

At approximately 1:00 p.m. on Wednesday, February 23, 2011, Plants approached 1634 Broadhead Street disguised as a letter carrier and knocked on the door to which a female later identified as Lynelle Glover answered. Plants notified Glover that he had a delivery for "Williams" and Glover indicated that she was expecting the package. Thereafter, Plants handed the parcel to Glover who placed it on the floor inside the house and he left.

Throughout the duration of the controlled delivery, Trooper Jeffrey Brautigam of the Pennsylvania State Police conducted surveillance from about two houses away from the Broadhead Street residence in his capacity as deputized member of the ICE task force. Minutes after Glover accepted the package, Brautigam observed a woman who matched the description of Glover leave 1634 Broadhead Street apparently carrying the parcel in a clear plastic bag. The individual suspected to be Glover placed the plastic bag in the trunk of a sport utility vehicle and

---

warrant before 3:00 a.m. on Saturday to permit normal delivery that day; and (2) his understanding that had he obtained a federal search warrant over the weekend, it would have been difficult to obtain the eight to ten officers necessary to staff a controlled delivery due to the limited personnel available over the holiday weekend.

drove away. Brautigam proceeded to alert the other law enforcement units who were supporting the controlled delivery, by radio, informing them that they could now conduct a traffic stop.

Trooper Edward Walker of the Pennsylvania State Police, another federally deputized task force member, answered the call alongside other ICE participants and began to follow the vehicle for three or four blocks before he activated his emergency lights and siren to initiate the stop. Glover cooperated with the command and pulled her automobile over to the side of the road. Walker, wearing a state police raid vest, then approached the vehicle with his weapon drawn, identified himself, and advised Glover that the reason for the stop was that the task force conducted a controlled delivery of the twenty to twenty-five pounds of marijuana in the package and that they now held the belief that she possessed the parcel and its contents in her vehicle.

Glover agreed to cooperate almost immediately, speaking to Walker for ten to fifteen minutes at the scene and also to Brautigam when they arrived back at the Broadhead Street residence. Once at the house, Walker executed a state search warrant of the house in which law enforcement found the Priority Mail label for the suspect parcel inside a trash receptacle, and Brautigam sat in the car with Glover advising her of her *Miranda* rights. Based on her conversations with Walker and Brautigam, law enforcement learned that Glover agreed to receive the package for her boyfriend, "Eric Williams" and to deliver him the parcel at a Denny's restaurant in Monroeville. Glover also explained that Williams planned to pay her $2,000 for receipt and delivery, which she planned to use in order to pay a fine.

While Brautigam and Glover spoke, she received multiple text messages from an individual she identified as Williams who told her to meet him at the Lowe's Home Improvement store ("Lowe's") in Monroeville instead of the Denny's restaurant. Glover agreed to arrange a meeting with Williams at Lowe's where he would be driving either a brown

Chevrolet Impala or a GNC Yukon both of which were registered in her name. Glover also described Williams to Brautigam "as a large black male, 6', 6'2", dark skin, [and] over 250 pounds." (Tr. 2 at 43).

Brautigam contacted Monroeville Police Detectives Jonathon Pawlowski and James Hredzak and advised them of the investigation and to patrol the Lowe's area in order to identify and apprehend Williams. Brautigam provided the local police officers with a description of the suspect and of the vehicles registered to Glover that Williams would be driving. Around the same time, Brautigam also observed a piece of luggage in Glover's vehicle with a tag in the name of "Kyle Pierre," to which he inquired. Glover disclaimed any knowledge of an individual by that name, but she informed Brautigam that the luggage belonged to Williams who had placed it in the backseat when she had picked him up at the airport the previous night. The luggage tag also indicated that the flight had originated in California and landed in Pittsburgh.

While still at the Broadhead Street residence, Brautigam received a telephone call from the local police detectives to inform him that they had located a brown Chevrolet Impala registered to Glover in the Lowe's parking lot and had watched a male matching the description of Williams enter the vehicle. That individual began to drive away and once the police officers activated their lights and siren, the Impala stopped. Both officers exited the unmarked car with Pawlowski wearing a raid jacket and Hredzak in plainclothes with a hanging badge who identified themselves as Monroeville police officers and requested his driver's license and registration. The driver provided a suspended Ohio license with the name "Kyle Pierre."

The detectives relayed this information to Brautigam who requested that they detain "Pierre" for additional questioning. Pawlowski and Hredzak asked "Pierre" to step out of his vehicle, patted him down, and handcuffed him. A uniformed vehicle transported "Pierre" to the

Monroeville Police Department where officers removed his handcuffs and placed him in a holding cell for less than thirty minutes until Brautigam arrived.

When Brautigam reached the police station, he escorted the suspect to an interview room where Detective Pawlowski, Troopers Lander and Moriarty were also present. After identifying himself orally as a police officer and showing his credentials, Trooper Brautigam inquired of the suspect's basic biographical information, including his name. However, Brautigam met some resistance when the individual repeatedly insisted "[i]t's on my driver's license." (Tr. 2 at 49). Brautigam asked no other direct questions at that point, but instead explained to "Pierre" that law enforcement seized the Broadhead Street parcel, that they were going to arrest Glover, and that the police could fingerprint him to learn his true identity. Brautigam also looked through the wallet that the police found on "Pierre" in an effort to discover his true identity, but only found two USPS parcel receipts. "Pierre" sat silent during this time, but apparently visibly upset and shaking his head.

After Brautigam's ten to twenty minute recitation and basic efforts to learn the individual's identity, "Pierre" finally admitted that his real name was Richard Hayes. Hayes wrote his name in a notebook provided by Brautigam who then began to advise him of his *Miranda* rights. According to Brautigam, he read aloud and verbatim to Hayes the paragraph advising an individual of his or her rights and asked him to read the waiver, explaining that signing the form was not an admission or confession of any kind. Hayes signed the waiver form, although in the wrong location. Brautigam and Trooper Lander also signed the form as witnesses.

After the waiver, Brautigam directly questioned Hayes about the marijuana parcel, and he admitted that it was his package and that Glover was to deliver the drugs to him. Brautigam

further inquired into the Ohio driver's license that he found in Haye's wallet at that time, alongside the two receipts.

Later that day, Plants began to investigate the two receipts for Priority Mail packages, locating one of the parcels on Thursday, February 24, 2012. That package was addressed to 8021 Saltsburg Road, Plum, PA, later determined to be Glover's primary residence.[5] Plants secured a federal search warrant for the suspect package and the residence where law enforcement personnel later found a photograph of Glover and Hayes together, airline bag tags in the name of Kyle Pierre that matched those found in Glover's car, and money gram receipts. The Saltsburg Road package, intercepted by postal inspectors before delivery could occur, was also found to contain four and one half kilograms of cocaine.

## Procedural History

On March 1, 2011, Walker filed a Criminal Complaint in the United States District Court for the Western District of Pennsylvania, which charged Hayes with conspiracy to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance in violation of 21 U.S.C. § 846. A Federal Grand Jury returned a two-count Indictment against Hayes for (1) the conspiracy charge from on or about February 17, 2011 and continuing thereafter to on or about February 25, 2011; and (2) attempt to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance from on or about February 22, 2011 and continuing thereafter to on or about February 24, 2011 in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2.

---

5. According to Trooper Walker, the Broadhead residence was not Glover's home, but instead recalls that it belonged to her brother's girlfriend. (Tr. 2 at 35-36) ("THE COURT: So the Broadhead residence wasn't her home? THE WITNESS: I believe it was a relation. I want to say it was a brother's girlfriend, but it was not hers.").

Along with many other pre-trial motions, Defendant filed a Motion to Suppress Evidence (Doc. No. 33) on November 17, 2011. Defendant's ten (10) paragraph motion set forth the following allegations that purportedly justified suppression: (1) that the February 23, 2011 warrant for the Broadhead Street package was not supported by probable cause; (2) that without that search, the existence of Glover would have remained undiscovered and therefore, all information that she later provided amounts to the fruits of an illegal search; (3) that the February 23, 2011 traffic stop of Glover was not supported by probable cause or reasonable suspicion; (4) that the arrest of Defendant was not supported by probable cause; and (5) that the warrant obtained by postal inspectors on February 24, 2011 for the second parcel was not supported by probable cause. The government disputed that motion in its entirety, and the Court agreed in its April 11, 2012 Memorandum Opinion and Order of Court (Doc. No. 41 at 14-20).

On April 19, 2012, Defendant filed a Supplemental Motion to Suppress Evidence and Motion for Reconsideration (Doc. No. 42), claiming that "[r]ulings on motions to suppress must be based on evidence and testimony, and defendant [ ] had a right to a hearing on the motion." (Doc. No. 42 at 2, ¶ 5). Accordingly, Defendant requested a hearing on the merits of its previously-denied motion and sought the government to produce the participants in the initial seizure for cross-examination. By Order of Court dated April 20, 2012, the motion was granted and an evidentiary hearing was scheduled.

Defendant thereafter filed an Amended Motion to Suppress Evidence (Doc. No. 44) on April 30, 2012, which included many of the same positions as his original filing with some additions. The Court ultimately conducted a two-day hearing on this matter. On June 19, 2012, the government presented and Defendant cross-examined Kathleen Wells, Stephen Celletti, and Brian Plants over the course of many hours. (Doc. No. 47). The hearing was continued to and

concluded on June 26, 2012 where the government presented and Defendant cross-examined three additional witnesses, Edward Walker, Jeffrey Brautigam, and Jon Pawlowski. (Doc. No. 50). The parties also submitted briefs outlining their respective positions after the hearings. (Doc. Nos. 58, 61).

<u>**Discussion**</u>

The Court perceives that Defendant's Motion and Brief in Support now advance at least seven separate theories, when read together, on why suppression of the evidence is appropriate. The Court will address each position seriatim.

**1.** <u>**The Search and Seizure of the Broadhead Street Package**</u>

Defendant claims that the initial removal of the Broadhead Street package by the USPS from the mail stream was an unreasonable seizure in violation of the protections guaranteed by the Fourth Amendment for two distinct reasons. First, relying on *United States v. Van Leeuwen*, 397 U.S. 249 (1970), Defendant contends that the delay in securing a search warrant and delivering the Priority Mail package from around midnight on February 18, 2011 until approximately 1:00 p.m. on February 23, 2011 constituted an unreasonable seizure for the purpose of the Fourth Amendment. Second, Defendant submits that the removal of the package was not supported by reasonable suspicion, focusing only on Well's belief that the odor resembled marijuana and her lack of qualifications to make that judgment. Thus, as Defendant concludes, the initial illegality tainted all subsequent searches and seizures, including the discovery of witnesses. (Doc. No. 58 at 9) (citing *United States v. Ceccolini*, 435 U.S. 268 (1978); *Brown v. Illinois*, 422 U.S. 590 (1975); *Wong Sun v. United States*, 371 U.S. 471 (1963)).

In response, the government again disputes those arguments in their entirety. The government first maintains that reasonable suspicion was not lacking because Wells was not alone in her belief, as the Defendant's brief would lead one to think. In addition to Wells, the government notes that many other employees also noticed the alleged odor, which Postal Inspector Celletti confirmed just hours later. The government also advances the position that the delay was not unreasonable when one considers the non-business hours, the federal holiday, and the unavailability of the Duty Magistrate Judge until the following Wednesday. Moreover, the government submits that the Court should recognize that the delay was effectively only one day even though the package remained in the possession of the USPS for three days before it reached Broadhead Street. To the government, the earliest the parcel could have reached its destination was Tuesday, February 22 after Wells removed it from the stream of mail for Saturday delivery because USPS does not deliver Priority Mail on Sundays or on federal holidays, such as Presidents Day which was Monday, February 21.

The Fourth Amendment guarantees that the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST., amend. IV. "A Fourth Amendment 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Brown v. Muhlenberg Township*, 269 F.3d 205, 209 (3d Cir.2001) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

At this juncture, the Court pauses to observe that the interdiction of the package by Wells to alert NLECC and to secure it for Celletti—undertakings certainly within her managerial

authority and prerogative—did not create a meaningful interference with Defendant's possessory interest in the parcel as to constitute a seizure. While it is questionable whether Celletti's later possession of the parcel (which did not technically delay delivery of the Priority Mail) interfered with that possessory interest to subject the package to the Fourth Amendment, a determination of that question is of no import as the Court concludes that any assumed seizure was not unreasonable as to violate the dictates of the United States Constitution. *C.f. United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir. 2002) ("The recipient of a mailed item, on the other hand, has a reasonable expectation that the mail will not be detained by postal employees beyond the normal delivery date and time.").

Consistent with the Fourth Amendment, the temporary detention of a mail parcel for investigatory purposes will not constitute an unreasonable search or seizure if the Postal Inspector first has a reasonable suspicion that it contains contraband. *United States v. Colon*, 386 F. App'x 229, 230-31 (3d Cir. 2010) (citing *Van Leeuwen*, 397 U.S. at 251-52). To make the determination of whether reasonable suspicion existed, "[a] district court must examine the totality of the circumstances confronting the officer at the time and eschew analyzing any one factor in isolation." *Id.* at 231 (citing *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)); *C.f. United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) ("It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause.") (citations omitted). While an officer may not merely act on a hunch to establish the existence of reasonable suspicion, "they may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.*; *see, e.g.*, *id.* ("Inspector Cottes was entitled to rely on his seventeen years of experience in intercepting suspicious mail

parcels . . . in determining whether reasonable suspicion justified detaining the package.") (quoting *United States v. Robertson*, 305 F.3d 164, 168 (3d Cir. 2002) (noting that an officer's "experience and training [are] indispensable to his evaluation of reasonable suspicion")).

Likewise, the temporary detention must also not be for an unreasonable length of time in order to satisfy the Fourth Amendment. *See United States v. Gonzalez*, CR.A. 02-446-01, 2003 WL 431636, *2 (E.D. Pa. Feb. 20, 2003) (citing *Van Leeuwen*, 397 U.S. at 251). In *Van Leeuwen*, the Supreme Court of the United States held that a twenty-nine hour delay between the mailings and the service of the warrant was not unreasonable within the meaning of the Fourth Amendment under the facts of that case. 397 U.S. at 253. However, the Supreme Court made clear that it was not creating a bright-line rule with regard to what timespan constitutes a reasonable delay, and other Courts have determined that intervals longer than twenty-nine hours do not violate the Fourth Amendment. *See, e.g., United States v. Ganser*, 315 F.3d 839, 844 (7th Cir. 2003) ("Under the circumstances of this case, the four-day delay in delivering the first letter was not constitutionally unreasonable."); *United States v. Gill*, 280 F.3d 923, 929-30 (9th Cir. 2002) (holding that a six day lapse was not unreasonable); *United States v. Crooker*, 415 F. Supp. 2d 28, 32 (D. Mass. 2006) (concluding that the seven day delay was not unreasonable but "probably approached the boundary of the Constitutional limit"); *see also Gonzalez*, 2003 WL 431636, at * 3 (collecting cases holding that delays from twenty-two hours up to six days as not unreasonable) (citations omitted). To calculate the length of the interval, courts have disregarded interruptions caused by intervening weekends and national holidays, *see, e.g.*, *Crooker*, 415 F. Supp. 2d at 31, as well as delays resulting from the unavailability of a Magistrate Judge, *see, e.g.*, *Gill*, 280 F.3d at 929. *See generally United States v. Hillison*, 733 F.2d 692, 696 (9th Cir. 1984)

("[T]he main Fourth Amendment interest in a mailed package attaches to the privacy of its contents, not the speed with which it is delivered.").

Here, the Court first finds that the government had reasonable suspicion to detain and secure the Broadhead Street package for investigatory purposes. When taken together, Celletti's actions and overall qualifications allowed him to draw reasonable inferences and deductions that the package contained drugs, easily confirming the USPS employees' belief that the package did in fact resemble the odor of marijuana. Celletti, a Postal Inspector for approximately eight years, was intimately familiar with and knowledgeable in the detection of marijuana based on his involvement in the searches of over one hundred drug parcels and his experience in smelling the drug on at least sixty or seventy occasions. Most importantly, Celletti did not make his finding on simply an unparticularized suspicion or hunch, but instead grounded his determination on the basis of his professional training, experience and judgment after he personally examined the parcel in a secured place and noticed the suspect odor emanating from a specific object. Accordingly, there was a sufficiently articulable and particularized basis to support a finding of reasonable suspicion, if not probable cause.

The only issue that remains with regard to this particular challenge is whether the timing was reasonable, the second requirement that must be met for a temporary confinement of a parcel to pass Constitutional muster as a permissible seizure under this two-prong approach. After careful consideration, the Court finds that the intervening weekend should not count against the reasonableness of the investigation and therefore, the one day delivery deferment does not warrant an unreasonable seizure as to justify suppression. The Court also concludes that the government agents were reasonably prompt in their investigation of this matter even when evaluating their conduct from Saturday to Wednesday instead of just the isolated one-day

window of delay. As his uncontroverted testimony indicates, Celletti believed that although he could obtain a warrant over the weekend, he thought it was unlikely to obtain the requisite number of officers to execute a controlled delivery due to the limited personnel available over the holiday weekend. Celletti instead secured the package just hours after he first learned of its suspicious nature and requested Plants to overtake the investigation within at least three days. Likewise, Plants acted promptly by attempting to secure a federal search warrant on Tuesday— the day he assumed responsibility of the investigation—based on an affidavit he also drafted that day. Plants obtained the search warrant the very next day and executed a controlled delivery just hours later, a delay due to the unavailability of the Duty Magistrate Judge and not because of any fault on his part. These events can hardly be equated to a situation where law enforcement attempts to obtain warrants for mailed packages at their leisure. Thus, under these circumstances, the Court cannot conclude that the delay in this matter was unreasonable for purposes of the Fourth Amendment.

Accordingly, the government has satisfied both the reasonable suspicion requirement and the reasonableness inquiry necessary for the temporary detention of the package, and therefore, the actions of the USPS employees and Postal Inspectors did not constitute an unreasonable search or seizure. The Court must now address Defendant's other challenges, as the later searches, seizures, and procurement of cooperative witnesses were not tainted by this investigatory detention of the package.

### 2. **The Warrant for the Broadhead Street Package**

Although Defendant does not specifically brief the issue at any meaningful length, his Amended Motion to Suppress Evidence raises the challenge that "the affidavit in support of the warrant [for the Broadhead Street package] did not identify the individuals who provided the

information on which it was based or specify the basis of their knowledge, rendering the warrant defective."  (Doc. No. 44 at 1); *see also id.* at 2 ("The warrant for the first parcel was not supported by probable cause, and without that search the existence of Lynelle Glover would have remained undiscovered.").  Defendant cites no authority in support of this proposition, nor does he invoke the mechanism allowing him to make a preliminary showing that a material statement in the affidavit is false or that a material omission in it amounts to a deliberate falsehood in order to overcome the general presumption of its validity.  The government previously briefed this issue in its March 13, 2012 Omnibus Response to Defendant's Pretrial Motions and incorporates by reference those arguments into its current brief.

By Memorandum Opinion on April 11, 2011, this Court upheld the issuance of the search warrant in its entirety.  The Court now summarily reaffirms the validity of the search warrant for the Broadhead Street package issued by the Duty Magistrate Judge on February 23, 2011 and similarly incorporates by reference its earlier determination of this issue.  Moreover, the Court also questions the veracity of Defendant's most recent submission on the basis that the Affidavit delineates that employees at the USPS Bulk Mail Center in Warrendale PA alerted the Postal Inspector who in turn conducted an independent investigation, as sufficiently outlined by Plants in the Affidavit to support a finding of probable cause for the search warrant.  Therefore, the Court again has no difficulty in determining that a substantial basis exists in order to support the Magistrate Judge's decision and that Defendant has made no preliminary showing other than a conclusory allegation in his attempt to have the warrant rendered defective.

### 3.  The Stop of Glover

Defendant next challenges the stop of Glover in her car, assuming *arguendo* that the search and seizure of the Broadhead Street package was lawful.  Defendant argues that the stop

of Glover after she left the Broadhead Street residence was based on speculation instead of the required reasonable suspicion. Defendant also asserts that he has a right to attack the stop because "Glover's statements to the officers would establish a possessory interest of [D]efendant in the package." (Doc. No. 58 at 9).

In response, the government submits that Defendant lacks standing[6] to raise this issue and vicariously assert a Fourth Amendment violation on behalf of Glover for his own benefit. The government also argues that law enforcement had reasonable suspicion, if not probable cause, to stop Glover in her car. The Court agrees.

An essential element to a successful challenge of a search and seizure "on Fourth Amendment grounds is the existence of a legitimate expectation of privacy." *Gov't of Virgin Islands v. Williams*, 739 F.2d 936, 938 (3d Cir. 1984) (citing *United States v. Salvucci*, 448 U.S. 83, 93 (1980); *Rakas v. Illinois*, 439 U.S. 128, 140-150 (1978)). "Since *Katz v. United States*, 389 U.S. 347 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy. The [Fourth] Amendment does not protect the merely subjective expectation of privacy, but only those expectations that society is prepared to recognize as reasonable." *Oliver v. United States*, 466 U.S. 170, 177 (1984) (citations, quotation marks and brackets omitted).

The Supreme Court has long held that individuals have legitimate expectations of privacy in letters and sealed packages. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). Consequently, the sender and addressee of a piece of mail have "a legitimate expectation of privacy even though he or she may not be in physical possession of the mail while it is en route."

---

6. The Court notes that the "standing" requirement, in the Fourth Amendment context, is "'shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated.'" *United States v. Stearn*, 597 F.3d 540, 544 n.2 (3d Cir. 2010) (citing *United States v. Mosley*, 454 F.3d 249, 253 n.5 (3d Cir. 2006)). That term is, however, used only to facilitate reference "with the understanding that the inquiry actually turns on the presence or absence of the defendant's legitimate expectation of privacy in the place searched." *Id.*

*United States v. Knuckles*, 4:CR-07-423, 2008 WL 794867, *2 (M.D. Pa. Mar. 24, 2008) (citing *United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984); *United States v. Richards*, 638 F.2d 765, 769-70 (5th Cir. 1981)).  This Fourth Amendment protection, as recently recognized by our court of appeals in a non-precedential opinion, may extend even when a package is addressed to an individual under fictitious names, as distinguished from parcels sent to a third-party.  *See United States v. Pettiway*, 429 F. App'x 132, 136 n.5 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 350 (2011) (quoting *United States v. Villarreal,* 963 F.2d 770, 774 (5th Cir. 1992)) (citations omitted); *see also Knuckles*, 2008 WL 794867 at *2 ("On the other hand, courts have also held that an individual who is not the sender or addressee generally does not have a legitimate expectation of privacy in a package.") (citing *United States v. Pierce*, 959 F.2d 1297, 1303 (5th Cir. 1992); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988); *Givens*, 733 F.2d at 341-42).

Similarly, the Fourth Amendment right to be free from unreasonable searches and seizures is a personal right, and "may not be vicariously asserted."  *Brown v. United States*, 411 U.S. 223, 230 (1973); *see also United States v. Padilla*, 508 U.S. 77, 81-82 (1993) ("[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.").  Indeed, there is "no recognition of the legitimacy of a defendant's expectations of privacy where the area searched is in the control of a third party."  *Gov't of Virgin Islands*, 739 F.2d at 938 (citing *Salvucci*, 448 U.S. at 132-33).

With those well-settled standards in mind, the Court finds Defendant's challenge to be without merit.  As a threshold matter, Defendant has asserted the privacy rights of a third-party (*i.e.*, the supposedly unjustified stop of Glover based merely on speculation) and not his own,

thereby failing to satisfy a requirement necessary in order to bring a Fourth Amendment challenge. To be sure, Defendant is not actually contesting the legality of any supposed physical search of Glover's vehicle, but rather argues that the stop was based on a purportedly speculative basis after she left the residence with an item resembling the suspicious package. Nonetheless, even if the Court construes Defendant's position as asserting a challenge to some search relative to the stop of Glover by law enforcement, Defendant does not have standing.

The Court is cognizant of Defendant's position that "Glover's statements to the officers would establish a possessory interest of [D]efendant in the package," as well as the principal that a defendant's "[p]ossessory interest in an item recovered during the search of another's property is a factor, but not determinative, in finding a legitimate privacy expectation." *Pettiway*, 429 Fed. App'x. at 135. However, that concept requires the Court to ask "not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched." *Salvucci*, 448 U.S. 83, 93.

To that end, even if the Court assumes that Defendant had a possessory interest in the package as the intended recipient such that a subjective expectation of privacy in that item existed, it is not "one that society would accept as reasonable when he solicits a third party to be the addressee." *Knuckles*, 2008 WL 794867, at *3. Likewise, nothing in the record even resembles an indication that he had an expectation of privacy in an area that law enforcement would have searched, namely Glover's automobile. The Court need not again consider at any length Defendant's argument that there was no reasonable suspicion to make the initial stop of Glover's car and hereby reaffirms and incorporates by reference its discussion on that issue in its April 11, 2012 Memorandum Opinion. *See* Doc. No. 41 at 18-19. Accordingly, the Court concludes that this particular challenge also fails to justify suppression of the evidence.

**4. <u>The Stop and Arrest of Defendant</u>**

Defendant next raises the challenge that the stop of him by the Monroeville Police in the Lowe's parking lot and following arrest was also based only on speculation and not reasonable suspicion. Defendant submits that "there was nothing to establish that Lynelle Glover was a reliable source." (Doc. No. 58 at 10). To support this contention, Defendant contends that Glover's statement with regard to her need for help in order to pay a fine is suggestive of a criminal history and that law enforcement made no attempt to determine whether such a history existed even though they determined that eventually.

The government again incorporates by reference its argument made in the Omnibus Response, supplementing its position with additional facts adduced at the suppression hearing. In sum, the government advances the position that the stop of Defendant by Monroeville Police Officers Pawlowski and Hredzak was a valid *Terry* stop, and once Defendant fit the description of "Eric Williams" offered by co-conspirator Glover coupled with him having produced the "Kyle Pierre" identification, probable cause existed to make the arrest.

The Court finds that the government has provided specific, articulable facts to justify the stop and, in view of the articulable facts outlined at length in the earlier Memorandum Opinion and as supplemented by the two-day suppression hearing, the Monroeville Police Officers had probable cause to arrest Defendant. The Court hereby incorporates by reference its discussion in the April 11, 2012 Memorandum Opinion and notes that the evidence at the suppression hearing reinforces the previous conclusion. Taken together, the Court concludes that this particular position of Defendant is also without merit.

**5. <u>The Seizure of the Postal Receipts from Defendant's Wallet</u>**

Defendant next contends that the search of his wallet and removal of the postal receipts

from it constituted an unlawful seizure because he was not yet under arrest at that time. As stated by Defendant, "[t]he search cannot be characterized as incident to a lawful arrest: no decision had yet been made to charge defendant with any crime or to take him into custody beyond the investigatory detention that Trooper Brautigam had requested." (Doc. No. 58 at 11). Defendant again states that suppression is also warranted under *Wong Son* because the detention itself was the result of the prior illegal search.

Not surprisingly, the government advances the opposite position. That is, the discovery of the postal receipts inside the wallet resulted from a lawful search incident to arrest irrespective of whether it occurred prior to or after law enforcement advised Defendant of his *Miranda* rights. The government also argues that even assuming that Defendant was not under arrest at the station, therefore nullifying its reliance on the search incident to arrest exception, it can justify the discovery of the postal receipts under the doctrine of inevitable discovery. The Court agrees with the foundation of the government's position and need not reach that latter point.

Search incident to a lawful arrest is a reasonable warrantless search and permits a "full search of the person [and] is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search under that Amendment." *United States v. Robinson*, 414 U.S. 218, 235 (1973). The scope of search incident to arrest may "involve a relatively extensive exploration of the person," *id.* at 237, and "searches and seizures [of the person] that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention," *United States v. Edwards*, 415 U.S. 800, 803 (1974).

The search may also extend to personal effects found on that person. *See generally United States v. Shakir*, 616 F.3d 315 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 841, (2010)

(discussing searches incident to arrest in light of *Arizona v. Gant*, 556 U.S. 332 (2009)).  As one district court noted, "under *Robinson* and its progeny, when law enforcement officers discover a personal effect on that person, the officers may search that item and the propriety of the search 'does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.'" *United States v. Cook*, CR 10-00376-3 JSW, 2011 WL 6748517, *5 (N.D. Cal. Dec. 22, 2011) (quoting *Robinson*, 414 U.S. at 236); *see also United States v. Rutley*, 11-2155, 2012 WL 1950408, *1 (7th Cir. May 31, 2012) ("[T[he Fourth Amendment permits officers to search, without a warrant, any container carried by an arrestee, including bags, purses, wallets, and books.").  Numerous courts have upheld the search of a defendant's wallet under the search incident to arrest exception to the warrant requirement. *See, e.g.*, United States v. Gordon, CR 11-00479-01 JMS, -- F. Supp. 2d -- 2012 WL 3939925, *10 (D. Haw. Sept. 10, 2012); (discussing searches of wallets found on a suspect in light of *Gant*); *United States v. Acosta*, 807 F. Supp. 2d 1154, 1233 (N.D. Ga. 2011) ("The search of his person and the seizure of any items on his person, such as his wallet and the contents of the wallet, are admissible as a search incident to arrest."); *United States v. Gomez*, 807 F. Supp. 2d 1134, 1143-44 n.5 (S.D. Fla. 2011) (collecting cases to support the proposition that "[h]istorically, and most analogous to the search at issue here, the broad grant of authority to search includes highly private articles on a person like a wallet . . . .").

Here, the Court finds that Defendant was lawfully arrested by the Monroeville Police Officers, subjecting his personal effects to a search.[7]  The record makes clear that law

---

7. The Court notes that Defendant argues contrary positions with regard to whether he was under arrest.  Comparing his Motion to his Brief in Support, the former states that "[h]e was removed from the car in a manner sufficiently forceful to constitute an arrest," (Doc. No. 44 at 2), while the latter relies almost exclusively on the testimony of Brautigam's testimony to support this challenge, (Doc. No. 58 at 4) ("He was in investigatory detention.").

enforcement officers placed Defendant in handcuffs, transported him to the police station, and placed him in a holding cell until questioning began. The Court again concludes that his detention was not the result of previous Fourth Amendment violations, as all prior searches and seizures have been found to be within the parameters of the Constitution. Thus, when the police went through his wallet, it was lawfully in police custody incident to his arrest subject to search and seizure, which hardly amounts to an "illegal rummaging." (Doc. No. 58 at 11).

Accordingly, the Court will not suppress the discovery of the postal receipts that led to the seizure of the cocaine in the package addressed to Saltsburg Road.

### 6. <u>The Statements Made by Defendant</u>

Defendant alleges that law enforcement questioned him at the police station in violation of *Miranda* and that any confession was involuntary under the circumstances. Moreover, Defendant contends that the statements made to him by Brautigam with regard to the impending charges against his "girlfriend" Glover were intended to induce him to take responsibility of the Broadhead Street package and that the police officers only told him that waiving *Miranda* rights was the same as acknowledging being informed of them. Once again, Defendant also invokes *Wong Sun* to justify suppression and argues that his statements were the fruits of the search and seizure of the postal receipts because "[t]he search, and the handing of the postal receipts to another trooper for further investigation, conveyed an expectation to [D]efendant that additional evidence would be seized." (Doc. No. 58 at 11).

The government relies on the "routine booking exception" to *Miranda* insofar as its agents were permitted to question Defendant in order to secure biographical data, such as his true identity. The government submits that it never elicited an incriminatory admission before Defendant was advised of and properly waived his *Miranda* rights.

It is black letter law that *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Alston v. Redman*, 34 F.3d 1237, 1246-47 (3d Cir. 1994) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). Interrogation means "express questioning or its functional equivalent . . . any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir.2006) (quoting *Innis*, 446 U.S. at 300-01).

The reach of *Miranda* does not, however, extend to "routine booking" questions necessary to "secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality) (citation and quotation marks omitted); *see United States v. Bishop*, 66 F.3d 569, 572 n.2 (3d Cir. 1995) ("[W]e join the other courts of appeals that have addressed the issue and recognize that there is a 'routine booking exception' to the requirements of *Miranda*."). When the questioning goes beyond acquiring such routine information, individuals can forgo their *Miranda* rights only through a knowing, intelligent, and voluntary waiver. *Miranda*, 384 U.S. at 436. Only statements that are voluntary may be admitted into evidence at a criminal trial, and the government has the burden of proving by a preponderance of the evidence that statements were voluntarily given and that it complied with *Miranda*. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46 (1983) (plurality); *see also United States v. Swint*, 15 F.3d 286, 288–89 (3d Cir. 1994).

Here, the uncontroverted testimony makes clear that no *Miranda* violation occurred and that all statements made by Defendant which would fall within the strictures of *Miranda* were made after he knowingly, intelligently, and voluntarily waived those rights. A review of Brautigam's testimony reveals that he only asked Defendant his name before the *Miranda*

warning, that he only told Defendant that law enforcement officers had executed a controlled delivery of the package to Glover, and that he only informed Defendant of his ability to fingerprint Hayes to make a positive identification. *See* Doc. 58 at 12-14 (reproducing the relevant portions of Brautigam's testimony). Conveying that information and inquiring into the then-uncooperative Defendant's background is well within Brautigam's authority as a law enforcement officer and does not rise to level of an interrogation under *Miranda*, as no request would necessarily incriminate Defendant and nothing indicates that Brautigam's purpose was to induce him into confessing in order to protect Glover. Simply put, there is no record evidence that any inquiry was for a purpose other than securing a name so that the law enforcement officers could formally charge and process Defendant. Only when Brautigam finally learned that "Eric Williams" and "Kyle Pierre" were not Hayes' true identity, did the trooper provide and Defendant waived his *Miranda* rights which led to his ultimate confession.

The Court finds that the *Miranda* waiver was valid and that his admissions were not "clearly the result of police intimidation." (Doc. No. 58 at 15). Defendant had the opportunity to review the entire warning after Brautigam read him the paragraph that advises an individual of his or her rights and explained to him that signing the form was not an admission or confession of any kind. Defendant then read and signed the waiver with at least two witnesses present, after which Defendant apparently offered his voluntary admission that seemingly was made without any prompting, manipulation or coercion. Indeed, the Court finds that the statements were completely voluntary and that there is unquestionably no record evidence to support a contrary conclusion.

Accordingly, the Court will again not grant suppression based on either the general *Miranda* challenge to the admissions or Defendant's oft-repeated *Wong Sun* justification. The

Court now turns to Defendant's final argument.

7. **The Search and Seizure of the Saltsburg Road Package**

Finally, Defendant again raises the supposed illegality of the warrant that Postal Inspectors secured in order to search the package discovered on the basis of the receipts found in his wallet, which was later found to contain the cocaine that forms the basis for the impending federal charges. In support, Defendant equates the search of the second package to an unlawful general search.

The government's response is little more than a brief incorporation of the argument it previously advanced on this issue.

By Memorandum Opinion on April 11, 2011, this Court also upheld the issuance of this search warrant. The Court again finds no basis to alter its previous ruling. Accordingly, the Court summarily reaffirms the validity of the search warrant for the Saltsburg Road package issued by the Duty Magistrate Judge on February 24, 2011 and similarly incorporates by reference its earlier discussion of this issue.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **2:11-cr-69** |
| **v.** | ) | |
| | ) | |
| **RICHARD HAYES,** | ) | |
| Defendant. | ) | |

## ORDER OF COURT

AND NOW, this 3rd day of December, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the AMENDED MOTION TO SUPPRESS EVIDENCE (Doc. No. 44), filed by Defendant Richard Hayes is **DENIED** in its entirety.

BY THE COURT;
s/ Terrence F. McVerry
Terrence F. McVerry
United States District Judge

cc: **James A. Wymard, Esq.**
Email: wymardanddunn@verizon.net

**Gregory J. Nescott, Esq.**
Email: gregory.nescott@usdoj.gov